UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>GREENSILL CAPITAL INC.,<br><br>                Debtor. | Chapter 11<br><br>Case No.: 21-10561 (MEW) |
| CRAIG R. JALBERT, as Liquidation Trustee of the Greensill U.S. Liquidation Trust,<br><br>                Plaintiff,<br><br>v.<br><br>EULER HERMES NORTH AMERICAN HOLDING, INC., f/k/a EULER ACI HOLDING, INC.; and EULER HERMES ACI<br><br>                Defendants. | Adversary Proceeding No. |

## COMPLAINT

Plaintiff Craig Jalbert ("the Liquidation Trustee"), in his capacity as the Liquidation Trustee of the Greensill U.S. Liquidation Trust (the "Liquidation Trust"), commences this action, *inter alia,* pursuant to Sections 544, 548 and 550 of the United States Bankruptcy Code, and the Uniform Fraudulent Transfer Act, to avoid and recover the fraudulent transfers of $3,326,136.92 paid by Debtor Greensill Capital, Inc. (the "Debtor") to Defendant Euler Hermes North American Holding, Inc. (f/k/a Euler ACI Holding, Inc.)("Euler") in connection with the 2019 acquisition of all of the outstanding shares of Finacity Corporation ("Finacity"). As set forth more fully herein, the Debtor, which was insolvent by any measure at the time of the Transfer, paid over $82 million for Finacity, an extremely overinflated price for a company that predictably sold two years later for less than 10 percent of that amount. The portion paid to Euler on account of its shares of Finacity was thus a fraudulent transfer.

1

## JURISDICTION AND VENUE

1.   This Court has subject matter jurisdiction over this action under 11 U.S.C. § 548 pursuant 28 U.S.C. §1334 because the claims arise under title 11 and in or relate to this Chapter 11 proceeding.   This is a core proceeding under 28 U.S.C. §157(b)(2)(A) and (H).

2.   Venue is proper in this district pursuant to 28 U.S.C. §1408 and 1409 because this adversary proceeding arises under title 11 and arises out of this Chapter 11 proceeding, pendning in this Court.

## PARTIES

3.   Plaintiff Craig Jalbert is the Liquidation Trustee of the Greensill U.S. Liquidation Trust, which was formed by this Court to recover and distribute assets to the unsecured creditors of the Debtor.  He has an address at 124 Washington Street, Foxboro, Massachusetts 02035.

4.   Defendant Euler is a corporation with a place of business at 800 Red Brook Blvd., Owings Mills, MD  21117.  Euler was previously a shareholder of Finacity.

## PRIOR BANKRUPTCY PROCEEDINGS

5.   On March 25, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. *11 U.S.C. §101 et seq.* (the "Code").

6.   On October 26, 2021, this Court entered its Amended Findings of Fact, Conclusions of Law, and Order Approving the Disclosure Statement and Confirming the Modified Second Amended Chapter 11 Plan of Liquidation for Greensill Capital Inc. (the "Confirmation Order").  The Confirmation Order approved the formation of the Liquidation Trust and the appointment of the Liquidation Trustee.

7.   Pursuant to the Modified Second Amended Chapter 11 Plan of Liquidation for Greensill Capital Inc. (the "Modified Plan"), the Liquidation Trustee was empowered to, inter alia, prosecute and settle any Claims of the Estate, including but not limited to Retained Causes of Action, without prior approval of the Bankruptcy Court.  The Retained Causes of Action include any actions pursuant to Section 544, 548 and 550 of the Code.

**FACTS**

**The Business of the Debtor**

8.  The Debtor was in the business of providing supply chain financing, primarily through its affiliated or related entities, including Greensill Capital (UK) Limited ("GCUK"). The Debtor, GCUK and its related entities are referred to herein as the Greensill Group.

9.  Supply chain financing consists of paying a supplier's invoice early at a discount and then collecting full payment directly from the purchaser on the due date.

10. The Debtor's employees facilitated supply-chain finance deals for the benefit of GCUK pursuant to an intercompany services agreement with GCUK dated June 10, 2013 (the "Services Agreement"), which entitled the Debtor to certain expense reimbursements and discretionary commissions from GCUK.

11. The Debtor did not have an independent source of revenue and was generally not a party to the transactions its employees originated. Rather, GCUK received the benefit of transactions procured by the Debtor and its employees. The Debtor was responsible for all of its rents, salaries, and other expenses, except as agreed to in advance by GCUK. In return, GCUK was obligated under the Services Agreement to compensate the Debtor in the amount of $24,000 per month. Prior to 2019, the Debtor and GCUK booked intercompany balances but did not have any loan agreement or enforcement mechanism—and at no point before 2019 did either party undertake collection efforts against the other.

12. On January 1, 2019, the Debtor and GCUK entered into a Call Account Loan Agreement for the Making of Advances up to a Balance of Forty Million US Dollars (the "GCUK Revolver"). The GCUK Revolver contained the hallmarks of a loan agreement, including the incurrence of interest. The Debtor was permitted to (and did) draw down on the GCUK Revolver for "general corporate purposes."

**The Finacity Transaction**

13. In early 2019, the Debtor began pursuing the acquisition of Finacity, a Delaware corporation based in Connecticut. Finacity was engaged in a business similar to the Debtor, including factoring and asset-based loans.

14. At that time, Finacity's founder and CEO, Adrian Katz ("Katz"), proposed that the ■■■

15. On April 3, 2019, the Debtor's founder, sent a formal proposal to Katz for the acquisition of Finacity ■■■

16. The Debtor's proposal substantially overstated the value of Finacity.

17. For example, Finacity historically had ■■■ In essence, Finacity presented a business model that was poised to run out of cash or at least face significant liquidity restraints in the relatively near term.

18. Other terms in the proposal further depressed Finacity's value upon acquisition, including ■■■

19. ■■■



4



20.     While a substantial factor in determining whether and at what price to purchase Finacity appeared to be the synergy of the sale as it related to Finacity customers, the Greensill Group personnel did not speak to Finacity's clients to determine if they had any interest in the Greensill Group's programs.

21.     The Debtor had no factual basis to believe that it could cross-sell Greensill Group products to Finacity customers., let alone at a sufficient magnitude to justify the inflated purchase price.  Nonetheless, the Greensill Group kept these synergy projections in their valuation model even after those projections were definitively debunked.

22.     Also, the due diligence on Finacity's technology platform showed that



23.     The Greensill Group retained PriceWaterhouseCoopers ("PwC") to perform financial and tax due diligence on Finacity.  PWC did not, however, perform due diligence into any projected or alleged synergies between the Greensill Group and Finacity.

██████████████████████████████████

25. The Greensill Group's valuation model contained other flaws. For example, the discount rate was based upon comparisons to purportedly similar companies. But these companies were not similar at all: ████████████████████████████████████

26. The Debtor did not undertake any market studies or similar research to support its projections, valuation model, or purchase price.

27. The Debtor did not retain an investment banker or other third-party professional to provide a valuation opinion or analysis regarding the proposed transaction with Finacity.

28. 

29. Nonetheless, and despite similar sentiments expressed by other board members, the Debtor's board ultimately approved the acquisition of Finacity at the vastly overstated valuation.

30. The Finacity Acquisition closed on June 10, 2019. The Debtor entered into a Stock Purchase Agreement to acquire 100% of the shares of Finacity for consideration of approximately $82,156,000 (without considering millions of dollars in other closing payments made by or on behalf of the Debtor) (the "Finacity Acquisition"). The consideration was compromised of: (i) $55,636,000 to be paid to Finacity's non-founding shareholders in two

6

installments—one at closing, and one on the first anniversary of the closing; and (ii) $26,520,000 to be paid to Katz and related parties in five annual installments.



32. The Greensill Group applied ████████████████████████████ ████████ when, in fact, the discount should have no more than 5% (and likely less). The Greensill Group used ████████████████████████████ ████████████████████████████████████████

Upon information and belief, the fair market value of Finacity's shares in their totality was no more than $15,000,000 ████████████████████████████ ████████████████████████████████████████

**The Avoidable Transfers to Euler**

35. In June 2019, the Debtor borrowed approximately $27,034,911 under the GCUK Revolver to fund the first round of payments required to close the Finacity Acquisition. The Debtor caused approximately $26.5 million of its borrowed funds to be paid and transferred to Finacity's non-founder shareholders, and another $6 million to be paid to other parties.

36. Of the $26.5 million, the Debtor caused $1,643,588.70 to be paid to Euler.

37. In June 2020, the Debtor borrowed approximately $32,790,105 under the GCUK Revolver to fund the second round of payments required under the Stock Purchase Agreement. The Debtor caused approximately $27.8 million of its borrowed funds to be paid and transferred to Finacity's non-founder shareholders, as well as $4.9 million to Katz.

38. Of the $27.8 million, the Debtor caused $1,682,548.22 to be paid to Euler.

39. The two transfers to Euler described above, totaling $3,326,136.92, are hereinafter referred to as the "Euler Transfers". The Euler Transfers were made in exchange for Euler's shares in Finacity.

40. The funds used to pay the Euler Transfers were property of the Debtor. Upon information and belief, the value of Euler's shares was inflated by a multiple of approximately 820x and, as such, Euler's shares were worth approximately $4,056.00 in the aggregate. Accordingly, the Debtor did not receive reasonably equivalent value in return for the Euler Transfers.

**The Debtor Was Insolvent at the Times of the Transfers**

41. At all relevant times the Debtor was insolvent.

42. Following the Finacity Acquisition, the Debtor carried Finacity on its balance sheet at a book value of approximately $80 million. When the value of Finacity is adjusted to its actual value of approximately $15,000,000 or less, the Debtor was balance-sheet insolvent as of June 2019 and at all points thereafter.

43. Further, the Debtor was already insolvent prior to the Finacity Acquisition as a result of draws on the GCUK Revolver and other liabilities. The Debtor had no material assets and no reliable revenue stream other than limited payments from GCUK under the Services Agreement.

44. As of December 31, 2018, (a) the fair value of the Debtor's assets was no more than $1,355,421, and (b) the fair value of the Debtor's liabilities was approximately $6,017,339.

8

Accordingly, as of December 31, 2018, the Debtor was balance-sheet insolvent by approximately $4,661,918.

45. As of June 10, 2019, when the Defendants received the 2019 Transfers, the Debtor's financial condition and balance sheet insolvency had worsened by virtue of among other things, the Debtor's draws on the GCUK Revolver to fund operations. Further, the Debtor drew over $27 million on the GCUK Revolver to fund the 2019 Transfers, but received stock in return with a value of less than $15 million.

46. The Debtor was balance-sheet insolvent at the time of the 2019 Transfers.

47. As of December 31, 2019, the fair value of the Debtor's assets was no more than $20,024,983, and the Debtor's liabilities were approximately $77,687,600.

48. Accordingly, as of December 31, 2019, the Debtor was balance-sheet insolvent by more than $57 million.

49. As of June 10, 2020, the Debtor remained balance sheet insolvent. The Debtor drew over $32 million on the GCUK Revolver to fund the 2020 Transfers, but received no further value in return.

50. As of December 31, 2020, the fair value of the Debtor's assets was no more than $21 million, and its liabilities totaled over $70 million.

51. Accordingly, as of December 31, 2020, the Debtor was balance-sheet insolvent by approximately $49 million.

**CLAIMS FOR RELIEF**

**Count I**

**(Fraudulent Transfer -- 11 U.S.C. § 548(a)(1)(B))**

52. The Liquidation Trustee repeats and re-alleges Paragraphs 1 through 50 as if fully set forth herein.

53. The Euler Transfers constitute a transfer of an interest of the Debtor in property.

54. The Euler Transfers were made within two years of the Petition Date.

9

55. The Debtor received less than reasonably equivalent value in exchange for the Euler Transfers.

56. The Debtor was insolvent at the dates of the Euler Transfers or became insolvent as of the result of the Euler Transfers.

57. The purchase of Finacity, including the Euler Transfer, left the Debtor with unreasonably small capital with which to engage in business.

58. At the time of the purchase of Finacity, including the Euler Transfers, the Debtor intended to incur debts or believed that it would incur, debts beyond its ability to pay as they matured.

59. The Euler Transfers constitute fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

## Count II

**(Fraudulent Transfer -- 11 U.S.C. § 544-Uniform Fraudulent Transfer Act)**

60. The Liquidation Trustee repeats and re-alleges Paragraphs 1 through 58 as if fully set forth herein.

61. The Euler Transfers constitute a transfer of an interest of the Debtor in property.

62. The Euler Transfers were made within two years of the Petition Date.

63. The Debtor received less than reasonably equivalent value in exchange for the Euler Transfers.

64. The Debtor was insolvent at the dates of the Euler Transfers or became insolvent as of the result of the Euler Transfers.

65. The purchase of Finacity, including the Euler Transfer, left the Debtor with unreasonably small capital with which to engage in business.

66. At the time of the purchase of Finacity, including the Euler Transfers, the Debtor intended to incur debts or believed that it would incur, debts beyond its ability to pay as they matured.

67. At the time of the Euler Transfer, GCUK and several other creditors held unsecured claims against the Debtor for an amount in excess of the Euler Transfers.

68. Such creditors could have avoided the Euler Transfer pursuant to the Uniform Fraudulent Transfer Act, as enacted in Delaware. 6 Del. Code §§1304(a)(2) and 1305(a)

69. The Euler Transfers constitute fraudulent transfers pursuant to the Uniform Fraudulent Transfer Act, as enacted in Delaware. 6 Del. Code §§1304(a)(2) and 1305(a)

70. Under Section 544 of the Code, the Trustee stands in the shoes of such creditors and has the right to avoid the Euler Transfers.

## Count III

### (Recovery of Transfer - 11 U.S.C. § 550)

71. The Liquidation Trustee repeats and re-alleges Paragraphs 1 through 69 as if fully set forth herein.

72. The Euler Transfers are avoidable pursuant to Section 548 of the Bankruptcy Code.

73. Euler is the initial transferee of the Transfer.

74. The Liquidation Trustee may recover the Euler Transfers for the benefit of the Debtor's estate.

## Count IV

### (Unjust Enrichment)

75. The Liquidation Trustee repeats and re-alleges Paragraphs 1 through 73 as if fully set forth herein.

76. As a result of the Euler Transfers, Euler was enriched at the expense of the Debtor and its creditors.

77. Euler had no just basis to believe that the consideration received in turn for its shares in Finacity was just and equitable.

78. It is just and equitable that Euler make restitution to the Liquidation Trustee on behalf of the Debtor's estate.

11

WHEREFORE, the Liquidation Trustee respectfully requests that this Court:

(a)   Enter judgment for the Liquidation Trustee and against Euler, on Count I, avoiding the Euler Transfers;

(b)   Enter judgment for the Liquidation Trustee and against Euler, on Count II, avoiding the Euler Transfers;

(c)   Enter judgment for the Liquidation Trustee and against Euler, on Count III, in the amount of $3,326,136.92, plus interest and costs;

(d)   Alternatively, enter judgment for the Liquidation Trustee and against Euler, on Count IV, and order restitution in an amount ot be determined at trial; and

(e)    Grant such other and further relief as is just and proper.

Respectfully submitted this 23rd day of March, 2023.

CRAIG JALBERT, LIQUIDATION TRUSTEE

By his attorneys,

*/s/ David B. Madoff*
David B. Madoff (NY#2296044)
MADOFF & KHOURY LLP
124 Washington Street
Foxboro, MA 02035
508-543-0040
madoff@mandkllp.com
